**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-69 (APM)** |
| **JORGE AARON RILEY** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

In his own words, the defendant, Jorge Aaron Riley, did not plan to come from California to Washington, D.C. on January 6, 2021, to "watch people talk." He was going "for the war." He purchased throwing knives, left a will for someone, and was prepared to "do what my president asks." And, on the sixth, he wore what he referred to as "war paint" and stormed the Capitol building, where he remained for an hour—all to, again in his own words, "stop the steal" and take "our country back." He did all of this while on pretrial release in another criminal case regarding his alleged child abuse. The government requests that this Court sentence Jorge Aaron Riley to 21 months of imprisonment (the high end of the applicable sentencing guidelines range of 15-21 months), 36 months of supervised release, $2,000 of restitution, and the mandatory assessment of $100.

## I.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 54, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  Injuries and Property Damage Caused by the January 6, 2021 Attack[1]

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Response Failures on January 6 (June 7, 2021), at 29, available at https://www.hsgac.senate.gov /imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.CapitolAttack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id; see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), available at https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), available at https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP 24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than $2.9 million.

**C.      Jorge Aaron Riley's Role in the January 6, 2021 Attack on the Capitol**

Riley, a military veteran and former political leader in the California Republican Assembly, planned to disrupt the transfer of presidential power ahead of time and then did so by joining the

attack on the Capitol on January 6. His crimes are documented through a series of his own social media posts, photographs and videos, open-source videos recorded by other rioters and the media, body worn cameras from the Metropolitan Police Department, and surveillance footage from inside of the Capitol.

### *Leading Up To January 6*

Riley made it clear on social media before January 6 that he was coming to Washington, D.C. to stop the transfer of presidential power. As early as December 24, 2020, Riley posted on Facebook, "I want to be president if we get into civil war. That's why you need me." On December 29, in a thread titled, "Joe Biden IS NOT MY PRESIDENT!," Riley posted, "Greetings from California, I am a French Speaking Native American Messianic Jew and President of the Sacramento Republican Assembly. See you in DC on the 6th." Later, on December 31, Riley posted, "I didn't think I was coming to hear anyone talk. . . . I am omw [on my way] bringing a tent and bag. I will do whatever my president tells me to." The same day, he added, "Fine, I'm going to DC but I am not going to watch people talk I'm going to watch over what I love," and included his phone number.

Beyond making his corrupt intent clear, he called on others to act too. On January 2, 2021, Riley posted, "I hope everyone remembers who did what in 2020. Those were silent were not leaders, those who sold you out didn't represent the People, and those who stand with US and to US are patriots! Right now People are either doing something about things or hiding under their beds." When another social media user messaged Riley, "our enemies won't leave without a war. Guilty will be arrested," Riley responded, "I'm going for the war."

Riley's words were not mere political rhetoric or puffery. On December 31, he purchased on Amazon six ninja tactical combat hunting kunai throwing knives with a leg sheath. On January

4

2, Riley messaged multiple other social media users that he intended to use them in DC on January 6, including, "In DC? Yes ma'am I just bought new kanai throwing knives and am going to do what my president asks." On January 4, Riley noted his concern that law enforcement officials might catch him, posting, "everyone's including me is worried TSA will steal them… like an election." To another user, he messaged, "I will just be getting into DC and checking nobody stole my throwing knives but I will try." That day, he posted a photograph (Riley Sent. Exhibit 1) showing one of the throwing knives he bought, adding, "they accessorize with my baby tomahawk."



*Exhibit 1*

Riley even went so far as to write a "will" to an individual he referred to as his "sister" before departing for Washington, D.C. On January 5, Riley messaged her, "I will to you my throwing knives and anything in my house. Bill will have my keys." She responded, "Wtf? You're

coming home. Knock it off." He replied, "Don't you know me? Love you sister. It's going to be awesome." That evening, on the eve of January 6, Riley posted on Facebook, "Do you really not get what is going to happen on the 6th? I absolutely am looking forward to that and NO MATTER WHAT THERE IS NOTHING THAT CAN STOP IT!!!!"

### *Riley's Approach To The Capitol*

Riley traveled to Washington, D.C. from his home in Sacramento, California just before January 6. He first joined others at the "Stop the Steal" rally, where he listened to former-President Trump's speech at the ellipse near the White House. While there, he posed in photographs with others in tactical, military gear and posted online, "Today at noon the Election is being challenged!!!" He then marched to the Capitol. En route, he recorded and posted a video (Riley Sent. Exhibit 2) showing those around him and zooming in on the Capitol, adding, "There's 100's of thousands of people marching on the Nation's Capitol!!!!"



*Screenshot of Exhibit 2 at 0:14*

### *Riley Ascends the Scaffolding*

Riley approached the Capitol Building from the west, witnessing and photographing rioters around him ascending the monuments at the Peace Fountain, the northwest scaffolding on the Capitol grounds, and the northwest terrace steps which he eventually ascended himself. *See* Riley Sent. Exhibits 3 and 4.



*Exhibit 3*       *Exhibit 4*

### *Riley's Breach of the Capitol Building*

Riley then breached the Senate Wing Doors along with a mob of other rioters at approximately 2:22 p.m.—only 10 minutes after the first breach of these doors. And Riley knew he was part of the early waves of rioters breaching the Capitol. Once inside the building, he took and posted a selfie, showing what he had previously described as his "war paint and feathers to go with my kanai blades." With his selfie (Riley Sent. Exhibit 5), Riley messaged, "I'm in the front where do you think I am."

7





**Jorge Riley**
January 6 at 4:24 PM · 🌐

I'm in the front where do you think I am

*Exhibit 5*

Once inside, Riley observed and photographed tear gas, shattered glass and other property destruction, and the law enforcement response around him. *See* Riley Sen Exhibits 6-8. Yet he continued deeper into the building for nearly an hour.



*Exhibit 6*



*Exhibit 7*



*Exhibit 8*

Inside, Riley marched from the Senate Wing Doors to then-Speaker of the House Nancy Pelosi's suite of offices, arriving at approximately 2:31 p.m. As evidenced by both his photographs of the Speaker's signs and an interview detailed below, Riley *knew* these offices belonged to the Speaker and marched through them regardless. While Riley and other rioters equipped with gas masks and helmets marched through this suite of offices, many of the Speaker's young staff were hiding under desks and tables in a locked conference room mere feet from Riley in the below screenshot of Capitol surveillance footage (Riley Sen Exhibit 9). *See United States v. Rhodes, et al.* (Case No. 22-CR-15), ECF 565 (sentencing memorandum detailing these victims and their location).



*Exhibit 9*

"We turned off all of the lights," one staffer later recounted, "and we hid under the table and no talking, we just said 'Do not speak.'" Riley Sen Exhibit 10.1 ("Pelosi In The House" Documentary clip). As then-Speaker Pelosi's senior advisor, Jamie Fleet testified in another trial

before this Court, "I was told, Absolutely don't [call the staffers]. They are hiding. They are trying to keep their phones quiet. We don't want any phone calls. We don't want any texts going off. We don't want to identify that there are people—you know, that they are right on the other side of the door." *Minuta, et al.* (Case No. 22-CR-15), 2/21/23PM Tr. at 3278. From their hiding place, a staffer made one phone call, whispering to a law enforcement official, "We need Capitol Police to come into the hallway. They're pounding the doors trying to find her now." Riley Sen. Exhibit 10.2 ("Pelosi In The House" Documentary clip). The staffers hid, silent and in the dark, for over an hour, terrified of what people like Riley might do to them. *Id.*

From there, Riley made his way to one of the balconies overlooking the west side chaos. Witnessing first-hand the haze of tear gas and violence erupting beneath him, he chose to take a selfie, mugging for the camera (Riley Sent. Exhibit 11).



*Exhibit 11*

Riley continued to push on. Reentering the Capitol from the balcony, he made his way one floor below to the Crypt by approximately 2:40 p.m. He joined a mob of hundreds of rioters pushing through police officers and chanting "Stop the steal," captured in open-source video (Riley Sen Exhibit 12, see 25:00min to 28:00min).



*Screenshot of Exhibit 12 at 27:15min*

From the Crypt, Riley continued to push through the Capitol and made his way back up to the second floor and into Statuary Hall by approximately 2:43 p.m. Multiple police officers ordered Riley and other rioters around him to leave—warning them, "This is a federal building. You are trespassing. Get out of the building now," as seen in open-source video showing Riley (Riley Sent. Exhibit 13, from 0:27 to 1:00). Riley did not leave. He instead posed with Nebraska's statue of Chief Standing Bear, as seen in the below screenshot from Capitol surveillance footage (Riley Sen Exhibit 14), and then pushed deeper into the building.



*Exhibit 14*

By 2:56 p.m., Riley marched into the Rotunda, where hundreds of other rioters had congregated. Eventually, a large number of Metropolitan Police Department (MPD) officers flooded into the Rotunda to clear the rioters out. Yet, Riley remained, as seen in open-source photographs and video (Riley Sent. Exhibit 15).



*Exhibit 15*

Eventually, MPD officers had to forcibly funnel Riley and the other rioters out of the Rotunda. Multiple other rioters around Riley fought the officers and refused to exit. Riley, as seen in MPD body-worn camera footage (Riley Sent. Exh. 16), remained in the Rotunda. Initially, he faced the officers and the Rotunda and away from the exit, making it clear he was not leaving. Despite the officers resorting to force to remove Riley and the other rioters, Riley continued to contribute to the mob that swarmed the Rotunda and obstructed the electoral process. After over 20 minutes in the Rotunda with the officers, Riley finally departed through the East Rotunda Doors at approximately 3:18 p.m. MPD body-worn camera footage (Riley Sent. Exhibit 16) depicts officers having to forcibly remove rioters around Riley from the Rotunda.



*Screenshot of Exhibit 16 at 6:49*

Finally, at approximately 3:22 p.m., Riley pushed his way through the East Rotunda lobby and doors out of the Capitol, as seen in Capitol surveillance footage (Riley Sen Exhibit 17). In total, Riley stormed around the Capitol for approximately one hour.



*Screenshot of Exhibit 17*

Despite being forcibly removed from the Capitol, Riley still did not leave the area. Once outside the East Rotunda Doors, Riley turned and faced the officers, continuing to participate in the riot to stop the transfer of presidential power. Open-source photographs (Riley Sent. Exhibit 18) show Riley now joining the mob *outside* the Capitol and facing the officers attempting to seal the Capitol and regain control.



*Exhibit 18*
14

After Riley departed the East Rotunda Doors, another rioter, defendant Stephanie Baez (Case No. 21-cr-507), recorded Riley detailing what he and other rioters had just done inside the Capitol (Riley Sent. Exhibit 19). Standing on the east steps plaza, Riley brazenly made it clear what he did, why he did it, and how he knew it was illegal:

> We breached over there I think. We broke windows, we went into the door, we pushed our way in, and then we just kept going further and further . . . we went into, there was like a corridor building. . . . We pushed our way to Nancy Pelosi's office . . . and then we were sitting in there yelling, "fuck you Nancy Pelosi."

At this point, Riley flashed both of his middle fingers to the screen to emphasize his contempt for the former Speaker of the House.



*Screenshot of Exhibit 19 at 0:39*

Riley then explained how he knew it was illegal and against police officers' commands, detailing that he "got pepper sprayed three times, and got fire-extinguishered." He added:

> When we went into one of the rooms, when they were trying to get all the legislators creeping away, one of our guys came in, there was like three of us in a room and everybody else was cops, so they . . . fire-extinguishered everybody in the room, and that's how the cops got away and we were able to keep going. . . . When we got up inside, they did come in and they set up this line, and they were like trying to push us out of the room. For a long time there was like a hella long power struggle, and we were pushing back and forth on each other, and we were being crushed and people were being trampled on and shit, and it was horrible.

Critically, Riley also explained *why* he forcibly stormed the Capitol on January 6th:

> It was mostly a peaceful, physical takeover of the Capitol. . . . We stopped the steal because they were in there and they weren't going to stop the steal, so we stopped the steal, we took our country back, fuck you guys.

*See* Riley Sent. Exhibit 19.

### Riley's Statements After January 6th

In the days following January 6, Riley posted over 150 messages, photographs, and videos in an album he titled, "Who's House? OUR HOUSE." Riley had no remorse for the events that occurred at the Capitol. Indeed, he was energized and, in his own words, prepared to die.

For example, in the immediate afternoon and evening of January 6,   Riley posted multiple messages on Facebook:

- "I choose Freedom and Fight."

- "What do you think I came for?"

- "Does this mean I took my land back?"

- "What do you do after you just got done taking your National Capitol back?"

- "I would hope People would know me well enough to know me. I came here to protect what I love and I am a Patriot! I asked for prayer, and I stood by my President, I stood

by other Patriots, and I stood for you."

Riley also directed his ire toward then-Vice President Michael R. Pence, who certified the electoral college vote late that evening after police successfully removed Riley and the riotous mob out of the Capitol (Riley Sent. Exhibit 20).



*Exhibit 20*

That night, Riley continued to post on Facebook. He made it clear he knew he might soon be arrested for his actions at the Capitol (Riley Sent. Exhibit 21).



*Exhibit 21*

On January 14, 2021, the Sacramento and California Republican Assemblies emailed Riley, "Jorge: I hereby DEMAND that you resign as President of the Sacramento Republican Assembly, CRA Board of Directors and the CRA IMMEDIATELY. This comes as a direct result of your illegal, felony actions at the U.S. Capitol." Riley responded to who he referred to as "Unpatriotic Non-Veterans Judging Me": I will at the request of you cowardly do-nothing unpatriotic bastards resign my post so that I don't 'Embarrass' you do-nothing cowards. It was my

18

honor to serve my country and my party that apparently left me. God bless America, and President
Trump."

Despite knowing what he did on January 6 was illegal, he did not turn himself in or contact
law enforcement officials. Rather, he threateningly posted his home address for those officials to
see, stating he was prepared to "die" on the hill he believed in (Riley Sent. Exhibit 22).



*Exhibit 22*

Days later, on January 19, 2021, the FBI arrested Riley at the address he provided.

## II.     THE CHARGES

On February 3, 2021, a federal grand jury returned an indictment charging Jorge Aaron Riley with five counts, including, corruptly obstructing an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 2, 1512(c)(2) (Count One); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); disorderly conduct in a Capitol Building, in violation of 40 U.S.C. 5104(e)(2)(D) (Count Four); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).

On, March 7, 2023, Riley pled guilty to Count One, agreeing that he corruptly obstructed the official proceeding taking place in the Capitol on January 6—namely, the certification of the electoral college vote for the 2020 presidential election.

## III.     STATUTORY PENALTIES

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, for a conviction of corruptly obstructing an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), Riley faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

As noted in both the plea agreement and the PSR, the Guidelines analysis is as follows:

<u>Count One: 18 U.S.C. § 1512(c)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[2] | +3 |
| | **Total** | **17** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **14** |

*See* ECF 53, Plea Agreement at ¶ 5(A); ECF 59, Final PSR at ¶¶ 37-48.

The U.S. Probation Office calculated Riley's criminal history as category I, which is not disputed and included in the plea agreement. ECF 53, Plea Agreement at ¶5(B); ECF 59, Final PSR at ¶ 53. Accordingly, based on the government's calculation of Riley's total adjusted offense level, after acceptance of responsibility, at 14, Riley's Guidelines imprisonment range is 15-21 months' imprisonment. Riley's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein. Although the government retained the right under that agreement to seek an enhancement under U.S.S.G. § 2J1.2(b)(1)(B) "if the offense

---

[2] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Riley admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses. And, as described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," it has elected not to do so.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Sentencing in this case is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As detailed in Section II(B) of this memorandum, Riley's felonious conduct on January 6 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Riley posted his intent to stop that process ahead of January 6, including by purchasing throwing knives and even sending *a will* to someone else in the event he did not come home alive. He then flew across the country and stormed inside the Capitol, making sure he was "in the front." For an hour, Riley caused mayhem in the Capitol, joining the riotous mob throughout the Capitol, and refusing to heed police officers' commands to "get out of the building, now." Ultimately, the officers had to get physical to get Riley and his fellow rioters out, where he promptly detailed to another rioter his actions and why he did it: to "stop the steal" and "take his country back." The nature and circumstances of Riley's offense was of the utmost seriousness, and fully support the government's recommended sentence of 21 months' imprisonment.

### B.    Riley's History and Characteristics

Riley is a veteran of the armed forces and former leader for both the Sacramento and California Republican Assemblies. Having sworn an oath to his country and community and the institutions that keep them running, he was primed to know better than to fly across the country and storm the legislative seat of government in his nation's capital. Yet he betrayed that oath in

22

favor of his misdirected personal beliefs.

Riley also has a significant and violent history of arrests and convictions related to abuse of alcohol and his children, which weighs in favor of a lengthy period of incarceration:

- In 2006, Riley pled to charges of recklessly and maliciously possessing destructive devices and explosives, including, 100 tracer rounds, four M.18 smoke canisters, and two rocket flares. Additional charges of possessing illegal tear gas and child cruelty were dismissed as part of the plea. ECF 59, Final PSR at ¶ 50.

- In 2007 and 2008, Riley was convicted of multiple counts of driving while under the influence of alcohol, and he committed multiple violations of probation after sentencing. *Id*. at ¶  51.

- In 2016, Riley pled guilty to one count of willful cruelty to his child. *Id*. at ¶  52.

- In 2018, Riley was arrested without prosecution for battery of his spouse. According to the arrest report, Riley was in a physical altercation with his spouse and pulled her hair. *Id*. at ¶  56.

- In 2019, Riley was arrested without prosecution for one count of inflicting corporal injury to his spouse/cohabitor. *Id*. at ¶  57.

- In 2019, Riley was arrested for child cruelty resulting in injury. This case is still pending. According to the arrest report, the defendant bent his child over a concrete wall and put his arm around the child's neck, choking him. Riley then grabbed the child by the hair and pulled him back onto the ground. While the child was on the ground, Riley kicked and hit the child in the ribs and head and choked him. *Id*. at ¶  58.

Riley's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a long series of arrests and offenses involving possessing dangerous weapons, abusing alcohol, and abusing his family. In fact, Riley committed this crime *while on release* in his pending child cruelty case. Riley's criminal history demonstrates a propensity towards violence that is concerning and weighs heavily in favor of a lengthy term of incarceration.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Riley's criminal conduct on January 6 was the epitome of disrespect for the law. Again, he flew across the country and committed these felonious acts all while on release in another pending case involving his alleged assaultive cruelty to his own child. His actions reflect a deep lack of respect for the law, his loved ones, others including law enforcement, and his country.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Riley has a criminal history category of I, his history of arrests and convictions shows a clear pattern of abusive, assaultive behavior. *See* Section VI(B) *supra*. Second, although Riley has now technically accepted responsibility by pleading guilty, his social media statements after January 6 were those of a man proud of his actions and prepared to "die"

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

for his cause. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Riley's own statements that he chooses "Freedom and Fight" and "stood for his president and stood for Patriots" demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his history of violent assault and rhetoric.

In fact, as recently as his plea hearing on March 7, 2023, Riley demonstrated a complete lack of remorse and need for specific deterrence. At the end of his plea hearing, he announced to the Court that he "wore his best Trump tie" before leaving the courtroom. After the hearing, Riley promptly attended a nightly vigil for January 6 defendants outside of the D.C. Jail, talking with inmates on the phone, joining in chants and songs with them, and standing under a "Prisoner of War – J6 – You Are Not Forgotten" flag. *See* Riley Sen Exhibit 23. Video of that vigil remains on Youtube, and the flag flying over Riley's head can also be found online.[4] Attending an event that openly refers to judges and prosecutors as "criminals" and January 6 defendants as "political prisoners" immediately after pleading guilty hardly constitutes "acceptance of responsibility."

---

[4] www.youtube.com/watch?v=neDlC67212I (J6 Vigil); freej6.com/products/flag (J6 POW Flag).



*Exhibit 23, Screenshot at 40:23 from the J6 Vigil Livestream on March 7, 2023*

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

26

### F.       Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the

27

offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

First, defendant, Thomas Adams, Jr. (Case No. 21-CR-354 (APM)) was found guilty of the same obstruction charge after a stipulated trial and faced the same criminal offense score of 17 before acceptance of responsibility. Adams was one of the first rioters to enter the Capitol through the Parliamentarian Doors after ignoring and marching past a line of police officers. Adams then made his way to the Senate Gallery and took numerous photographs. He spent a total of 23 minutes in the building, only left after police removed him along with other rioters, and stated publicly afterward that he would repeat his actions. This Court sentenced Adams to 14 months' incarceration after confronting a higher criminal history category. Here, Riley spent significantly more time in the Capitol, ignored and marched past many more lines of officers throughout the building, and similarly has demonstrated a significant lack of remorse.

Second, defendant, Andrew Alan Hernandez (Case No. 21-CR-445 (CKK)) pled guilty to the same obstruction charge, faced the same Guidelines range, and was sentenced to 18 months' imprisonment. Hernandez was a 45-year-old veteran of the Marine Corp, was close to the front of rioters trying to break into the Capitol, breached the East Rotunda Doors, and marched deeper into the Capitol making it to the Senate Gallery. Although Hernandez did not commit any assaults himself, his presence in the riot in the Capitol allowed others to commit violence by providing safety in numbers and increased the obstruction of the proceeding. And Hernandez's post-January 6 social media posts reflected a lack of remorse for his actions. Riley is similarly a veteran that violated his oath to support and defend the Constitution, similarly marched throughout the Capitol (and was inside for much longer), and similarly revealed a lack of remorse in both his post-January 6 actions and post-plea actions. But Riley was in the Capitol longer and committed all of these acts while on release for another pending felony criminal case.

Third, and finally, defendant Josiah Colt (Case No. 21-CR-74 (TFH)) pled guilty to the same obstruction charge. Colt anticipated "war" ahead of January 6 and wrote, "[n]ow is the time to fight." He brought weapons and gear but ultimately left them in his hotel not in Washington, D.C. On January 6, Colt breached the Capitol and made his way to the Senate Gallery. Afterward, Colt celebrated his actions in a social media video. In part because he turned himself in days later and agreed to cooperate, Colt received a 15-month sentence based on the same Guidelines range applicable here. Riley was in the Capitol for a significantly longer period of time and did not turn himself in or ever cooperate with law enforcement officials.

Ultimately, a sentence of 21 months' imprisonment would not present any unwarranted disparities between Riley and any similarly situated January 6 defendants. If anything, such a sentence would present a warranted parity across defendants who anticipated violence and the disruption of the election proceeding, significantly contributed to the obstruction that day by participating in the riot throughout the Capitol despite not committing any assaults, demonstrated a lack of remorse in their statements and actions, and did so while on release for another criminal case. Riley's actions warrant a significant sentence.

## VI.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted

under 18 U.S.C. § 3663(a)(3), that Riley must pay $2,000 in restitution, which reflects in part the

role Riley played in the riot on January 6.[8] ECF 53, Plea Agreement at ¶ 12. As the plea agreement

reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14" in

damages, a figure based on loss estimates supplied by the Architect of the Capitol and other

governmental agencies as of April 2022. *Id.* (As noted above in footnote 1, the amount of damages

has since been updated by the Architect of the Capitol, USCP, and MPD.) Riley's restitution

payment must be made to the Clerk of the Court, who will forward the payment to the Architect

of the Capitol and other victim entities. *See* ECF 59, Final PSR ¶¶ 35, 115.

---

covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense
against property … including any offense committed by fraud or deceit," "in which an identifiable
victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not
qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can
be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9
(D.D.C. 2012) (citations omitted).

## VII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 21 months of imprisonment (the high end of the applicable sentencing guidelines range of 15-21 months), 36 months of supervised release, $2,000 of restitution, and the mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:    _____
Troy A. Edwards, Jr.
Assistant United States Attorney
N.Y. Bar No. 5453741
Assistant United States Attorneys
U.S. Attorney's Office, District of Columbia
601 D Street NW
Washington, D.C. 20530

**Sentencing Exhibits**

1. Riley Sent. Exhibit 1 – Riley photograph of throwing knife and tomahawk
2. Riley Sent. Exhibit 2 – Riley video on march to Capitol
3. Riley Sent. Exhibit 3 – Riley photograph of rioters on Peace Fountain
4. Riley Sent. Exhibit 4 – Riley photograph of rioters on NW scaffolding
5. Riley Sent. Exhibit 5 – Riley selfie at front of riot breaching Capitol
6. Riley Sent. Exhibit 6 – Riley photograph of tear gas inside Capitol
7. Riley Sent. Exhibit 7 – Riley photograph of shattered glass inside Capitol
8. Riley Sent. Exhibit 8 – Riley photograph of law enforcement officers inside Capitol
9. Riley Sent. Exhibit 9 – Screenshot of USCP CCTV footage of Riley in House Speaker suite
10. Riley Sent. Exhibit 10.1 – Clip from HBO Documentary
11. Riley Sent. Exhibit 10.2 – Clip from HBO Documentary
12. Riley Sent. Exhibit 11 – Riley selfie on balcony overlooking west side of Capitol
13. Riley Sent. Exhibit 12 – Open-source video showing Riley inside the Crypt
14. Riley Sent. Exhibit 13 – Open-source video showing Riley inside Statuary Hall
15. Riley Sent. Exhibit 14 – Screenshot of USCP CCTV of Riley in Statuary Hall
16. Riley Sent. Exhibit 15 – Open-source photograph of Riley in Rotunda
17. Riley Sent. Exhibit 16 – MPD Officer K.G. BWC showing Riley in Rotunda
18. Riley Sent. Exhibit 17 – Screenshot of USCP CCTV showing Riley in East Rotunda Lobby
19. Riley Sent. Exhibit 18 – Open-source photograph showing Riley outside Columbus Doors
20. Riley Sent. Exhibit 19 – Open-source video showing Riley detail his actions at the Capitol
21. Riley Sent. Exhibit 20 – Riley Facebook messages
22. Riley Sent. Exhibit 21 – Riley Facebook messages
23. Riley Sent. Exhibit 22 – Riley Facebook messages
24. Riley Sent. Exhibit 23 – Screenshot of video showing Riley at "J6 Vigil" on 3/7/23

**Transcripts**

1. *U.S. v. Roberto Minuta, et al.* (Case No. 22-cr-15) – 1/6/23 Transcript of Jamie Fleet
2. *U.S. v. Thomas Adams, Jr.* (Case No. 21-cr-354) – Sentencing Transcript
3. *U.S. v. Josiah Colt* (Case No. 21-cr-74) – Sentencing Transcript