**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:21-CR-00069-APM |
| JORGE RILEY | |

**DEFENDANT'S SENTENCING MEMORANDUM**

On September 6, 2023, this Court will sentence Mr. Riley, a disabled veteran, on his guilty plea to aiding the obstruction of an official proceeding, a violation of 18 U.S.C. § 1512(c)(2) and § 2, at the U.S. Capitol on January 6, 2021.

In the ordinary felony case, the *moral* wrongfulness of a defendant's actions is not subject to much debate. Here, when he pleaded guilty, Mr. Riley conceded the *legal* wrongfulness of his actions. But the moral question is a finer one. Mr. Riley traveled to Washington and entered the Capitol at the urging of the President of the United States, whom he regarded as his Commander-in-Chief, because he believed the President's claim that the 2020 election was stolen. More than two and a half years later, even with the former President under felony indictments in this district and elsewhere, millions of Americans continue to believe this claim and hope that President Trump will retake the White House, where he has vowed to pardon all the protestors he encouraged to come to Washington on January 6.

While the law condemns Mr. Riley's actions and requires the Court to impose just punishment, millions of citizens would regard Mr. Riley as a patriot who was motivated by the greater good. He appreciates that the Court is responsible for imposing a sentence "sufficient,

but not greater than necessary" to punish him, to promote respect for the law, and to deter others. *See* 18 U.S.C. § 3553(a).  But he didn't board the plane to Washington on January 5ᵗʰ expecting to return home a felon.  His involvement in the January 6ᵗʰ protest has cost him dearly.  In that darkness, he asks the Court to sentence him to the time he has already served (36 days) and to permit him to serve the remainder of his guideline term in home detention so that he may continue to parent his one-year-old daughter and continue to address the long-standing injuries resulting from his years of military service.

## I.    Procedural History.

The government obtained a criminal complaint against Mr. Riley on January 18, 2021, and the FBI arrested him at his home in Sacramento the next day, January 19.  The magistrate judge in Sacramento detained him over objection on January 27, and he remained in custody until this Court released him on February 24, 2021.

In the midst of his detention, a grand jury on February 3, 2021, charged him with a felony violation of 18 U.S.C. § 1512(c)(2) and with several misdemeanor charges that the government will move the Court to dismiss at sentencing.  On March 7, 2023, Mr. Riley appeared before this Court and pled guilty to the felony charge.  He will be sentenced on September 6, 2023.

## II.    Objection to the Presentence Report.

The final presentence report filed August 16 left several of Mr. Riley's objections unresolved, so he asks the Court to order the report amended as follows.[1]

---

[1]    There are also several obvious factual errors in the Probation Officer's sentencing recommendation filed August 16, doc. 60.  First, Mr. Riley did not "travel[] alone by car" to Washington – he flew.  Second, he did not "force[] entry" into the Capitol – he walked through a door with other protestors.  Third, he did not "assault . . . members of law enforcement."  If he had, the government would have charged him for it.  Counsel defers to the Court as to whether these factual errors require formal correction.  To the extent they play a role in the officer's recommendation of a low-end prison sentence, the Court should disregard them.

**A.  The PSR Should Reflect that Mr. Riley Brought No Weapons.**

Paragraphs 20 and 21 accurately note that Mr. Riley posted on Facebook that he had purchased Kunai throwing knives which he suggested he would take with him to Washington. However, the reporter refused to add that Mr. Riley *did not* take any knives or other weapons with him to Washington.  For various reasons (one of which was that he believed that possession of these knives was unlawful in the D.C. area) he decided to leave them behind.  He does not anticipate that the government, with access to photographic evidence, will dispute this. Accordingly, he asks the Court to amend the report at paragraph 21 to state, "He did not take any weapons with him to Washington."

**B.  Paragraph 59 Should Be Stricken.**

Paragraph 59 describes an arrest on January 16, 2008, for being drunk in public, and describes an incident in which the person arrested was riding a bicycle and found to have multiple warrants.  The probation officer provided records of the arrest to defense counsel.  The records describe the arrest of a Black man named David Kahana who is four inches taller than Mr. Riley.  Ex. A.  Mr. Riley asks the Court to strike paragraph 59.

**C.  Defense Guidelines Calculations.**

Mr. Riley concurs in the guidelines calculations set forth in the PSR, which are also consistent with the government's calculations as set forth in the plea agreement.

- o  **Offense Level Calculation**
    - ▪  2J1.2 Base Offense Level                                  14
    - ▪  Specific Offense Characteristic: § 2J1.2(b)(2)      +3
    - ▪  Acceptance of Responsibility
        - •  3E1.1(a)                                                      -2
        - •  3E1.1(b)                                                      -1
    - ▪  Total Offense Level                                        **14**

- ○ **Criminal History Calculation**

    - ▪ Criminal history point:
        - • 5/30/16 misdemeanor diversion        1 point

    - ▪ Criminal History Category                                **I**

- ○ **Offense Level 14 and CHC I custody range        15-21 months**

## III.    Application of the § 3553(a) Sentencing Factors.

The Court knows that it must impose a sentence that is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing.  *See* 18 U.S.C. § 3553(a).  These purposes are judged in reference to "the nature and circumstances of the offense and the history and characteristics of the defendant."  *Id.*

### A.  Mr. Riley's History and Characteristics.

Mr. Riley is 45 years old.  He lives in Lincoln, a suburb of Sacramento, with his girlfriend Kelli Morgan and their one-year-old daughter, Reagan.  He is an American Indian.  He never knew his biological father and knows nothing about him today.  He survived an abusive childhood in which he and his mother both were frequently beaten by his stepfather.  As a child he had to parent his own siblings, learning how to cook and clean when he was in the third grade. He says that, when he was a boy, "I gave up on happiness," and went years without smiling. "My smile today is a miracle from God," he says.  His childhood was dark.  Today, he hesitates to describe himself as close to his mother, although he pays her bills and brings her food.  "My mom's hard life made her a very mean woman."

As a boy, Mr. Riley determined to overcome the trauma of his childhood.  He resolved early in life to join the military as soon as he was able.  He was the first person in his family to graduate high school.  At 18, he proudly enlisted in the United States Army, where he served with distinction for four years, followed by another three years as a reservist.  He received

numerous commendations and separated as a specialist with an E-4 rank.  To this day, he is deeply proud of his Army service.

While a soldier, Mr. Riley damaged his back as a result of frequently carrying a heavy rucksack and an enormous machine gun.  His Army exercises destroyed the cartilage in both of his knees as well as throughout his body.  The Veterans Administration has deemed him to be 100 per cent disabled.  Despite the constant pain, he does not use pain medication:  "Anything that keeps me from thinking clearly makes me feel vulnerable," he says.  He expects to have knee-replacement surgery soon, and regularly sees his doctors at the local V.A. hospital.

After separating from the Army, Mr. Riley struggled with homelessness.  He was deemed 100 per cent disabled only in 2023, so for many years lacked a roof over his head.  Despite his disability, Mr. Riley has attended local community colleges for years, earning multiple A.A. degrees, and he has worked towards a degree in business with an emphasis in accounting at California State University, Sacramento.  Until his conviction, he had hoped to work as a forensic accountant, but will not be able to become licensed because of his status as a felon.

His relationship with Ms. Morgan has been the best relationship of his life.  "She is not broken," he says.  They have parented Reagan together with no rough patches.  Her employment income combined with his disability has given them and Reagan a comfortable and stable place to live.  Mr. Riley is admired by his neighbors, two of whom (Jeanette and Mike) have written separately to the Court urging leniency, noting his friendly generosity.[2]

Mr. Riley is the primary caregiver for Reagan, who is 16 months old.  While Ms. Morgan is at work, Mr. Riley attends to Reagan at home, where he also prepares meals, maintains the

---

[2]     Nine character reference letters accompany this memo as exhibit B.  Counsel has redacted email and home addresses, phone numbers, and signatures, but can make unredacted copies available to the Court and counsel upon request.

yard, and escorts Ms. Morgan's older boys to their martial arts classes.  Despite being prosecuted for his activities on January 6, he is enjoying the greatest period of stability since he separated from military service, and he hopes not to lose that stability to imprisonment.

**B.  The Nature and Circumstances of Mr. Riley's Offense.**

Even before the election took place, President Trump planted in the minds of his supporters the idea that a victory by his opponent would be the product of fraud.  After the votes were counted in early November and President Biden was declared the victor, President Trump, his aides, and pro-Trump news outlets hammered the message that the election had been "stolen."  The spread of these claims is commonly known, and the President's actions behind the scenes to lend credence to his claims is recounted in the former President's own criminal indictment in D.C. case no. 1:23-CR-00257.

Mr. Riley believed these claims, as did many millions of other Americans.  Mr. Riley supported President Trump and still doubts the validity of the 2020 election.  As a staunch Republican, an activist in the California G.O.P., and a military veteran, he was proud to fly to Washington to join President Trump's rally entitled "Stop the Steal."  He stood in the crowd on the Mall and heard the President urge his supporters to march to the Capitol and to confront Congress while the final vote was to be ratified in a joint session led by the Vice President.  Mr. Riley used his Covid-19 stimulus check – prominently bearing the President's distinctive bold signature – to purchase his plane ticket.

The presentence report, the criminal complaint, and the government's sentencing memorandum record Mr. Riley's fervent social media posts in the days preceding and following his trip to Washington.  But what they will not do is put those comments in proper perspective.  When Mr. Riley flew to Washington, he saw himself as participating in an important moment of American history, and he was electrified about it.  Less than a week before, he posted, "I will do

whatever my president tells me to do."  Four days before, he wrote, "I hope everyone remembers who did what in 2020.  Those who were silent were not leaders."  One day before, he wrote, "Do you really not get what is going to happen on the 6th?"  On the morning of January 6, he posted, "Today at noon the election is being challenged!"  While marching to the Capitol with other protestors, he wrote, "There's 100's of thousands of people marching on the Nation's Capitol!!!"  He claimed to be "in the front," although the Capitol had been breached by others 20 minutes before he and over 2000 others walked peaceably through the door.

Once inside, he performed no physical acts of obstruction, no pushing and shoving, and no violence.  Like many others who entered that day, he felt that he had been treated cordially by authorities, even welcomed at times.

And, afterwards, he was proud.  "I won't say I did nothing while communism over ran my country.  I won't say I stood by.  Come take my life.  I'm right here."  His proud social media postings gave him the unique honor of being among the first to be arrested.

When he traveled to Washington to "Stop the Steal," Mr. Riley intended to support his President, believing the leader's claims that the election had been stolen.  Obviously, he wasn't getting his news from CNN or watching Rachel Maddow, so he did not doubt that his cause was righteous.  After all, it was supported by the President himself, who, as the dust began to settle that day, told his supporters, "Go home.  We love you."

Mr. Riley personally damaged nothing.  He took no papers and no souvenirs.  When he saw others who had been injured, he aided them without regard to their status as protestor or policeman.  He carried no weapons.  He was violent towards nobody.

### C.  The Sentencing Guidelines Range.

The government includes a paragraph much like this one in all its January 6 sentencing memoranda, explaining that the sentencing guidelines are conceived to be the rational and fair product of careful reflection based on the wisdom of collective experience.  "The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).  The Commission is charged with promoting "'greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) , quoting *Rita*, 551 U.S. at 349; 28 U.S.C. § 994(m).  Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

But the guidelines are not persuasive when the Sentencing Commission has never addressed the unusual, unforeseen offense-circumstances present in the January 6 cases:  (1) when thousands of persons act together to vindicate a perceived wrong; (2) when their actions are informed by sincere beliefs backed with public support and news reports; and (3) when their actions are personally encouraged by the persuasive authority of the President of the United States.  Even before *United States v. Booker,* 543 U.S. 220 (2005), loosened the reigns of mandatory guidelines, section 3553(b) authorized the Court to depart below the guidelines when it found a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."  *Also see,* Guidelines Manual § 5K2.0(a)(3).  A riot or protest in a public building, encouraged by the President of the United States and prompted by widespread news reports of accusations of fraud, emanating from the White House itself, was

something that nobody envisioned.  Such an event has elements of public authority, which in some instances may be a complete defense to a criminal accusation.  *See, e.g., United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976).  The involvement of the head of the Executive Branch of government in inciting the events of January 6 is a mitigating factor that was never envisioned by the Commission.

Because of the proliferation of false news reports and the encouragement of the President, the guidelines lack persuasive force in this case.  The evidence shows that Mr. Riley flew to Washington and marched to the Capitol at the urging of the President himself.

**D.  Just Punishment and the Need for Deterrence.**

Mr. Riley recognizes that the Court is required to impose a just punishment for his conduct, but he has already faced substantial punishment as a result of his decision to enter the Capitol on January 6.  His participation cost him his position as corresponding secretary for the California Republican Assembly less than two weeks after January 6.[3]  His arrest was widely reported in his community.  He spent 36 days in custody at the Sacramento County Jail, an exceptionally harsh place where inmates are confined to their cells for 23 hours per day.[4]  His hope of working as an accountant or attorney have ended.

---

[3] "Activist Jorge Riley resigns from CA Republican Assembly after storming the Capitol," N.Y. Post, Jan. 15, 2021.

[4] An opinion piece in The Sacramento Bee, published on Nov. 10, 2021, begins: "The Sacramento County Main Jail at Sixth and I streets is a disaster," and goes on to quote an attorney, "The Sacramento County Jail is in many ways unique in the harshness of its conditions of confinement."  https://www.sacbee.com/opinion/article255334376.html.  The jail has been subject to a consent decree administered by a local U.S. District Judge.  For the past 30 years, this writer has had multiple clients demand to plead guilty and be sentenced as rapidly as possible in order to be moved from the jail.

The sentence he proposes – time-served followed by a year of home detention – is itself a substantial punishment.  And it is a just one, considering the circumstances:  that Mr. Riley, a proud and patriotic Army veteran, acted out of sincere concern for the welfare of his country, with encouragement from the President himself.

As for deterrence, Mr. Riley is keenly aware from studying the news of other January 6 cases that both specific and general deterrence are important aims of these prosecutions.  The heavy sentences imposed on January 6 protestors have been far more widely reported than have the dozens of probationary and non-custodial sentences imposed on persons who simply entered the Capitol and walked around without committing acts of vandalism or violence.  This week brought the news that Proud Boys Joseph Biggs was sentenced to 17 years and Zachary Rehl to 15 years.

The government has succeeded in advancing its message of deterrence in these cases.  Perhaps ironically, however, the Department of Justice itself has cast doubt on the claim that imprisonment deters others from committing crimes.  In a May 2016 broadsheet by the National Institute of Justice, "FIVE THINGS ABOUT DETERRENCE," item 4 states: "Increasing the severity of the punishment does little to deter crime."[5]  "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes."  *Id.*  Item 2 states, "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime," and explains that "Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crime."  *Id.*  Wide reporting of

---

[5]      The publication may be found at:  https://www.ojp.gov/pdffiles1/nij/247350.pdf.

the heavy sentences imposed on the worst of the January 6 protestors is likely to have some deterrent effect, but it is not necessary to imprison Mr. Riley in order to send that message.

Probationary sentences were once the norm in the District Courts. In the years preceding enactment of the Sentencing Reform Act, nearly one-half of persons charged with federal crimes were not sentenced to imprisonment. The statistics are reflected in this chart, which appears in an article by Prof. Melissa Hamilton of the University of Houston Law Center.[6]



Figure 1: Federal Defendants Sentenced Each Year to Prison or Alternatives[23]

A felony conviction was itself once regarded as punishment enough for many crimes, particularly for those not involving violence, theft, or destruction of property. A felon carries a

---

[6] M. Hamilton, "Prison-by-Default: Challenging the Federal Sentencing Policy's Presumption of Incarceration," Houston Law Review, Jan. 2014.

heavy stain on his record that may deprive him of job opportunities, public benefits, and, in many jurisdictions, the right to vote.  That has happened here.

### E.  Avoiding Disparities

The defense has identified two cases in which this Court has sentenced a defendant whose most serious charge was obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2).  In both cases, this Court varied below the applicable guideline range.

*United States v. Thomas B. Adams, Jr., 1:21-CR-00354-APM*.  Mr. Adams was found guilty after a stipulated-facts trial of violating 18 U.S.C. § 1512(c)(2) and of entering or remaining in a restricted building in violation of 18 U.S.C. § 1752(a)(2).  Like Mr. Riley, he came to Washington to support President Trump, entered the Capitol, remained there for a period of time, but committed no acts of violence or vandalism.  Unlike Mr. Riley, he entered the Senate Chamber where the votes were to be certified, although after the Chamber had been cleared.  After he was convicted in reliance on his stipulation, he denied guilt to a local reporter, resulting in the loss of credit for accepting responsibility, and his criminal history landed him in category III.  With a guideline range of 30 to 37 months, this Court sentenced him to 14 months incarceration.

*United States v. Matthew Wood, 1:21-CR-00223-APM.*  This case, also similar to Mr. Riley's, resulted in no imprisonment.  Mr. Wood traveled to Washington, D.C. on January 6 after sending a message to a contact, "If they want to raid Congress, sign me up, I'll be brave heart in that bitch!"  He wrote that he was "down for whatever they want to do" and he bragged that he was prepared to die and shed blood. After arriving on Capitol grounds, he also climbed a  media tower and urged others forward. He entered the Capitol through a window broken by other rioters, then spent about 80 minutes inside the Capitol, entering the house Speaker's office and

conference room.  Tear gas kept him from entering the Senate Chamber.  The government sought

a sentence of 57 months but this Court sentenced him to 36 months of probation with 12 months

to be served on home detention.

### F.  Protection of the Public.

Mr. Riley was one of over 2000 Americans who acted together at the instigation of the

President to enter the Capitol to "stop the steal."  His conduct was not violent and did not put the

public at risk of future crimes.  Indeed, the circumstances of January 6 are not likely to recur,

given that no President before Donald Trump has the disdain for truth that led to the January 6

protest.  Nothing about Mr. Riley's involvement shows a need to protect the public from further

crimes. In addition, United States Sentencing Commission "research has demonstrated that

reductions to sentence length and time served do not harm public safety." *Transforming Prisons,*

*Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst., 21 (Jan. 2016).

This is consistent with a "research demonstrat[ing] that longer sentences do not reduce

recidivism more than shorter sentences." J. Austin, "How Many Americans Are Unnecessarily

Incarcerated?" Brennan Ctr. For Justice, N.Y. Univ. Law School, 35 (2016).  Some studies have

concluded that prison stays longer than 12 to 20 months have diminishing returns, causing higher

recidivism.  *Id*.  A 2002 Justice Department study "found that recidivism rates did not differ

significantly among those released after serving 6 months or less compared to those serving

sentences all the way up to 30 months in prison." *Id*. at 36.

### G.  Need for Medical Care and Other Treatment.

Mr. Riley is a disabled veteran who receives regular care at the local V.A. hospital in

Sacramento.  He is presently nursing a broken collarbone, but his more serious conditions

include severe arthritis in his back and in his knees.  He expects to have knee-replacement

surgery in the near future.  He has also struggled in the past with homelessness and depression,

although he has enjoyed peace and stability over the last year since moving in with his girlfriend, Kelli Morgan.  Ms. Morgan is concerned that imprisoning Mr. Riley, with the ensuing loss of his disability income, will put the family in difficult straits, since his income constitutes half the family income and because he also provides childcare for their daughter while Ms. Morgan works.

### H.  Restitution

Restitution is itself a part of punishment. *See United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) ("[R]estitution is […] part of the criminal defendant's sentence.").  Mr. Riley has agreed to pay restitution of $2000 to the Architect of the Capitol.

### I.  Mr. Riley Asks the Court to Sentence Him to Time Served and Home Detention.

The low-end of the guidelines calls for a sentence of 15 months.  With good-time credits and credit for the 36 days he spent in pretrial detention, Mr. Riley would serve slightly more than 11 months in the Bureau of Prisons, exclusive of any early-release credits under the First Step Act, and without counting early release to community confinement under 18 U.S.C. § 3624(c). The sentence he proposes substitutes a year of home detention for additional imprisonment beyond the 36 days he served in Sacramento.  This sentence would result in a *longer* period of confinement than he would face if sentenced to a guidelines term of imprisonment, but it would be a less harsh sentence, and allow him to continue to support his family, attend to his medical needs, and to put the mistakes he made on January 6th behind him.

More important, it would recognize the unique circumstances faced by all who traveled to Washington at the urging of the President and who entered the Capitol in a misguided, dangerous, and wrongful effort to "Stop the Steal."  Many of these defendants are good people, and Mr. Riley is one of those.  Attached to this memorandum are letters from friends, neighbors,

a fellow veteran, Ms. Morgan, and from others active in Republican politics.  Each of them notes a different characteristic about Mr. Riley – his kindness, generosity, patriotism, sincerity, remorse, and so on.  But they all agree that he is a good man.  The Court should recognize those qualities as well and afford him the chance to continue to support his family and to build on the life he has made since his arrest two and a half years ago.

### IV.      Conclusion.

Mr. Riley respectfully asks the Court to impose a sentence of time served, to be followed by supervised release with a condition including 12 months home detention in lieu of imprisonment.

Respectfully submitted,

*/s/ Tim Zindel*

TIMOTHY ZINDEL
Attorney for Jorge Riley

Sacramento, California
September 1, 2023